**Marvin MUSIC, Appellant,**

v.

**Sheard (S. W.) WADDLE, Appellee.**

Court of Appeals of Kentucky.

May 8, 1964.

Harris S. Howard, Howard, Francis & Howard, and W. W. Burchett, Prestonsburg, for appellant.

Burnis Martin, Paul E. Hayes, and Conley & Hayes, Prestonsburg, for appellee.

PALMORE, Judge.

The appellee, Sheard Waddle, while crossing a street on foot, was struck and severely injured by an automobile driven by Marvin Music. His suit for damages resulted in a verdict (signed by nine jurors) and judgment in the amount of $13,793.09, from which Music appeals.

The trial court overruled appellant's motions for a directed verdict at the close of appellee's evidence and at the conclusion of all the evidence and likewise overruled his motion for a judgment n. o. v. He contends he was entitled to a peremptory because the proof was insufficient to support a finding of negligence on his part and because under any reasonable view of the evidence Waddle was contributorily negligent as a matter of law. Having concluded that the latter proposition is correct, we need not pass judgment on the first.

The accident occurred on North Lake Drive (U. S. Highway 23) in the City of Prestonsburg at about 2:30 one Saturday afternoon in April. There was no evidence of unusual or inclement weather conditions. Music was driving northward and Waddle was crossing from east to west at a point some 80 feet north of Patton Street,

which intersects North Lake Drive. Coming from the south, North Lake Drive is a two-lane street about 20 feet wide until it reaches Patton Street, where it broadens to 40 feet, allowing for parking in the two outer lanes. Waddle's intended destination was a grocery store located on the west side of this 40-foot street 80 feet north of Patton Street, the nearest intersection.

On the afternoon in question Jack Hurd, Waddle's stepson, drove him in Hurd's automobile to a point on the east side of the street across from the grocery store and parked the automobile alongside the curb, headed north. Waddle got out on the side toward the curb, went to the rear or south end of the car, and stood on or next to the curb for a brief interval watching traffic until he thought it was safe for him to cross. There were no vehicles parked behind the Hurd automobile, so he had a clear view southward and did in fact see the approaching car driven by Music. He testified that as the last northbound vehicle ahead of Music passed where he was standing he looked to the left and saw Music at the intersection a block south of Patton Street. The distance between them being well over 600 feet,[1] Waddle felt that he had plenty of time and, without again looking southward, started across the street. After taking five or six steps and just short of reaching the center line of the street he was struck by the Music car, which left skid marks 40′ 6″ long before coming to a stop 29′ 6″ beyond the approximate point of impact.

Expert testimony deduced from the skid marks and corroborated by other evidence established conclusively that Music was traveling at a speed of something less than 30 m. p. h. when he applied his brakes and that he was in his proper traffic lane 2′ 3″ to the right of the center line of the street.

At the time of the accident Waddle was

[1.] Waddle's estimate was 45 to 60 yards, but according to a map introduced by stipulation it was 631 feet from the south line of the grocery property across the street from Waddle to the north line of

78 years of age but did not have any impairment of vision or other physical infirmity except for the fact that he could not hear well. He was accustomed to walking a good deal. In attempting to cross the street he was moving as rapidly as possible for a man of his age and condition. The manner in which he proceeded to cross the street immediately after an automobile occupied by the witness Angeline George passed by his position was described at various points in his testimony as follows:

On direct examination:

Q-66 "Let me ask you this question: Did you say that you looked up there and saw this car coming?"

A— "Yes, sir."

Q-67 "Is that the car that hit you?"

A— "Yes, sir, that was the car that hit me. Not the first one. The first one was about 15 or 20 feet away and when it passed me I ran across the highway."

Q-68 "We are talking about this car, though, that you saw coming up there by George's hardware at the next block that you said you saw coming with some man looking over toward the river."

A— "Yes, sir."

Q-69 "Now, is that the way you looked just before you started across the highway?"

A— "That is the way I looked. I seed I had plenty of time, that way, this one was coming up, and then I looked up and this woman was just ready to pass and then I looked and I seed Mr. Music coming. * * *"

*     *     *     *     *     *

the intersecting street through which Music was passing. Waddle testified that "I crossed right opposite the door of the storehouse I went to trade at."

Q–76 "Now, go ahead and tell about where you started across the street there."

A– "And then this woman, she was about 15 or 20 feet of making it down there. I had looked down the way and then I turned and looked up the way and I saw him, and then when I saw him, this woman, about the time I got through viewing him, she had passed by me and I started across. I went across pretty fast."

Under cross-examination:

Q–159 "When you looked up the highway and you saw Marvin Music's car, or what later turned out to be Marvin Music's car, up there about the George Hardware, did one car pass after that?"

A– "Well, it was just about the same time. That one was there and I knowed it, and I looked up that way and saw him."

Q–160 "Now, can you tell the jury, whether or not, there was a car passed after you looked up there and saw him?"

A– "No, there wasn't none passed."

*    *    *    *    *    *

Q–166 "Did you start walking across or did you start running across?"

A– "I went walking fast."

Q–167 "How?"

A– "About as fast as a man my age could walk, you know."

*    *    *    *    *    *

Q–169 "Did you ever see Marvin Music's car any more from the time you saw it up at the George Hardware until it hit you?"

A– "I don't remember. That is when I took my eye off of him."

Q–170 "You looked up there and saw it coming up there at George's

Hardware store and then you never looked back any more?"

A– "No, I don't think so."

Q–171 "And you never looked back any more until you started running across or walking across?"

A– "I just looked down the highway to see where I was going and I started across in a trot or a walk. I was trying to make as much speed as I could and try to get over."

Q–172 "Was it a trot or a fast walk?"

A– "Well, I wouldn't know what to call it."

Q–173 "I believe you testified about this once before, didn't you?"

A– "Yes, sir."

Q–174 "I believe at that time you said you were running?"

A– "Well, I don't guess I could run as far as running is concerned. I can walk pretty fast. There are men that could walk a lot faster than I could run."

And in his pretrial discovery deposition:

Q–31 "Well, what just exactly happened then, Mr. Waddle, after you said that one car passed and what did you do then?"

A– "Well, when that car passed that was a coming down—"

Q–32 "Was that going towards Prestonsburg?"

A– "Yeah it was. It come on a past and then I looked on and I seen it was a getting pretty close to me, and I looked on up there further about where Malcolm George's Hardware was. I don't know who sells there now or whether he sells or who it is, that sells hardware. Right there at the crossing I discovered this car and I

thought to myself, 'Well, he is a coming slow and when this other one gets by I will catch a chance and dart on across.' And just as this car got by, I started across and he hit me before I got over there. There wasn't nothing—there wasn't nothing between me and him. There was nothing to keep him from seeing me and nothing to keep me from seeing him."

Q–33 "And you say you saw a car down there about where Malcolm George used to have their hardware store?"

A–. "I seen him a coming and he wasn't I didn't think a traveling too fast, but he must have been traveling faster than I judged him to be. It was about forty-five (45) or sixty (60) yards above me. I would guess it at being right about that."

Q–34 "Well, were you walking or running when you started across the road, Mr. Waddle?"

A– "I was running. Well, you know, an old man like me can't run too good anyhow but I was getting along as fast as I could."

Q–35 "After you saw this car down at Adams & George's Hardware, did you look back in that direction any more?"

A– "No, sir, never looked back no more. I just turned my head and looked down and seen one a coming up and I thought I had plenty of time and started across."

Q–36 "About how many steps did you take out there, Mr. Waddle, before you had the impact with the car?"

A– "Well, I wouldn't know. I didn't take very many though."

Q–37 "Did you start running from the curb?"

A– "Yes, sir, I just jumped off of the curb and started running to rush across there."

Angeline George, a passenger in the automobile that passed immediately before Waddle started his rush into the street, noticed him standing on the curb apparently looking toward the south. Music, however, did not become aware of his presence until he saw him "shoot across" in front of him, whereupon he (Music) instantly applied his brakes.[2] Music testified that he was moving along in a line of traffic at a speed of about 25 m. p. h. Bertha Hackworth, who was driving northward on North Lake Drive "right behind" Music, was introduced as a rebuttal witness in Waddle's behalf and, on cross-examination, confirmed Music's estimate of his speed.

The nearest traffic light on North Lake Drive was four blocks south of Patton Street, and there were no traffic signs or marked crosswalks at any of the intersections.

Among the numerous automobile-pedestrian cases this court has decided over the past several decades there are some in which the pedestrian, having looked once before he leaped, was held entitled to a jury determination of whether his failure to look again was negligent or, if so, whether such negligence was a proximate cause of the accident. Cf. Wilder v. Cadle, 227 Ky. 486, 13 S.W.2d 497 (1929); Murphy v. Homans, 286 Ky. 191, 150 S.W.2d 14 (1941); Layne v. Cottle, 286 Ky. 221, 150 S.W.2d 684 (1941); and Ramsey v. Sharpley, 294 Ky. 286, 171 S.W.2d 427 (1943).[3]

2. At the time of giving a pretrial deposition Music was under the impression Waddle had come out from between two parked cars, but it was established beyond question that no vehicle was parked or stopped behind Hurd's automobile.

3. See also Miracle v. Flannery's Adm'r, Ky., 259 S.W.2d 689 (1953), and Shuffitt v. Martin, Ky., 268 S.W.2d 928 (1954), holding that the question of proximate cause is for the jury where a pedestrian, though crossing between intersections in

Layne v. Cottle appears to have been an intersection case, whereas Wilder v. Cadle, Murphy v. Homans, and Ramsey v. Sharpley involved attempts by the pedestrian to cross between intersections and not within a marked crosswalk. It would be technically possible to draw a distinction between the latter three cases and this one on the ground that in none of them did the plaintiff admit having seen the approaching vehicle before attempting to cross. See, for example, the comment by Judge Thomas in Layne v. Cottle (at 150 S.W.2d 684, 686) suggesting that the pedestrian's failure to continue a lookout is not negligent per se *unless* he has already observed the approaching vehicle, in which event it may or may not be, depending on the particular facts. However, it is our opinion that Wilder, Murphy and Ramsey are basically unsound in that under the facts of each of them the pedestrian should have been held contributorily negligent as a matter of law. Unquestionably the policy of the court in those cases was to emphasize subsection (d) of KRS 189.570(4).[4] Conceding this to be a laudable purpose, yet it seems to us that subsection (d) of KRS 189.570(4) is no more than a statement of duties that would be incumbent on the motorist without it, and that these decisions, if strictly and logically followed, all but destroy the effect subsection (a) of the statute obviously was intended to have. To the extent, therefore, that they are in conflict with this opinion they are overruled.

■ It is the opinion of the court that Waddle was contributorily negligent as a

matter of law and that his negligence was a proximate cause of the accident. The approaching car driven by Music was in plain view from the moment Waddle left the curb until he was struck down by it. Whether he misjudged its speed, its distance from him, or both, or was simply mistaken in testifying that he last saw it more or less simultaneously with the passage of the vehicle in which Mrs. George was riding, is immaterial. That a reasonable man would have taken another and closer look as he proceeded across the street is a proposition on which we find no room for difference of opinion. Waddle admitted he made no attempt to do so.

■ In arriving at our decision in this case we have considered a number of recent opinions which, despite various points of factual distinction, rather clearly evince a strong policy with respect to the enforcement of KRS 189.570(4) (a). See Brown v. Vanhook, 359 S.W.2d 612 (1962); Clark v. Smitson, 346 S.W.2d 780 (1961); Leslie-Four Coal Company v. Brock, Ky., 343 S.W.2d 820 (1961); Kelley v. Reece, 273 S.W.2d 369 (1954); and Travis v. Embry, Ky., 257 S.W.2d 64 (1953).[5] The proper place for a pedestrian to cross a city street is at an intersection or in a marked crosswalk. If he chooses to cross at some other place, KRS 189.570(4) (a) charges him with the duty to yield. Unless this provision is to be reduced to something less than a statutory mandate, the necessity of keeping a reasonable lookout for his own safety cannot end at the curb, but must continue until he clears the street, because for him

violation of the law, is hit by a vehicle being driven on the wrong side of the street.

4. The pertinent subdivisions of the statute are as follows: "(a) Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right of way to all vehicles upon the roadway. * * * (d) Notwithstanding the provisions of this subsection every operator of a vehicle shall exercise due care to avoid col-

liding with any pedestrian upon any roadway, shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing a child or a confused or incapacitated person upon a roadway."

5. In Brown v. Vanhook and Leslie-Four Coal Company v. Brock there was evidence that the pedestrian walked into the side of the vehicle, a distinction that certainly would be immaterial if the pedestrian had no duty to continue his lookout while crossing.

the statute has declared the street a danger area as a matter of law.

■ As the trial court was correct in declining to instruct on last clear chance,[6] Music was entitled to a directed verdict.

The cause is reversed with directions that a judgment be entered dismissing the action.

6. See Severance v. Sohan, Ky., 347 S.W.2d 498, 501 (1961).